Revised September 3, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 97-30231

---

MARY L. HELMS, individually and as next friend of Amy T. Helms; AMY T. HELMS, a minor; MARIE L. SCHNEIDER,

      Plaintiffs - Appellants - Cross Appellees - Appellees,

VERSUS

CECIL J. PICARD, Louisiana Superintendent of Public Education; KENNETH DUNCAN, Louisiana State Treasurer; LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION; JEFFERSON PARISH SCHOOL BOARD SYSTEM; ELTON LAGASSE, Superintendent of the Jefferson Parish School System; LAURIE E. ROLLING, President and member of the Jefferson Parish School Board; LIBBY MORAN, Vice President and member of the Jefferson Parish School Board; ROBERT WOLFE, member of the Jefferson Parish School Board; BARRY BORDELON, member of the Jefferson Parish School Board; O.H. GUIDRY, member of the Jefferson Parish School Board; CEDRIC FLOYD, member of the Jefferson Parish School Board; POLLY THOMAS, member of the Jefferson Parish School Board; GENE KATSANIS, member of the Jefferson Parish School Board; MARTIN MARINO, member of the Jefferson Parish School Board,

      Defendants - Appellees - Cross Appellants,

and

RICHARD W. RILEY, Secretary of the United States Department of Education; UNITED STATES DEPARTMENT OF EDUCATION,

      Defendants - Appellees,

and

SPECIAL EDUCATION SERVICES CORPORATION,

      Defendant - Appellant,

and

GUY MITCHELL; JAN MITCHELL; EUGENE CERISE; KATHY CERISE,

Intervenor Defendants - Appellees - Cross Appellants.

_____

Appeals from the United States District Court
For the Eastern District of Louisiana
August 17, 1998

Before DUHÉ, BENAVIDES and STEWART, Circuit Judges.

JOHN M. DUHÉ, JR., Circuit Judge:

I.

This case requires us to find our way in the vast, perplexing desert of Establishment Clause jurisprudence. Plaintiffs, as taxpayers, sued Defendant Jefferson Parish School Board *et al.*, claiming that three state and one federal school aid programs were unconstitutional as applied in Jefferson Parish, Louisiana.[1] The district court initially granted Plaintiffs' motion for summary judgment on some issues. The court then conducted a bench trial on the remaining issues and rendered judgment. When the case was reassigned due to the district judge's retirement, the new judge reversed some of the court's earlier rulings. All told, the parties spent some thirteen years in district court before reaching this Court. During that time the sand dunes have shifted.

II.

Plaintiffs first challenge Louisiana's special education

_____

[1]The challenged aid programs and the procedural history of the case are more fully developed *infra*.

2

program, codified at LA.REV.STAT.ANN. § 17:1941-1956 (West 1982 & West Supp. 1998), as administered in Jefferson Parish, under the Establishment Clause. After a bench trial, the district court ruled that the special education program was unconstitutional as applied, because it had the impermissible effect of advancing religion and because the monitoring necessary to prevent such an effect would result in excessive entanglement between church and state. See Helms v. Cody, 856 F.Supp. 1102, 1121 (E.D.La. 1994)("Helms").

## A.

"It is and shall be the duty of state, city and parish public school systems of the state of Louisiana to provide an appropriate, free, publicly supported education to every exceptional child who is a resident therein." LA.REV.STAT.ANN. § 17:1941 ("special education statute").[2] Louisiana law defines "special education" as "any program of instruction within the preschool, elementary, and

---

[2]An "exceptional child" is one who is

> mentally disabled, gifted and talented, hard of hearing, deaf, speech impaired, severe language disordered, visually impaired, emotionally disturbed, orthopedically impaired, hospital/homebound, other health impaired, learning disabled, which includes attention deficit disordered and dyslexia, traumatic brain injured, or autistic, and as a result may require special education or services.

LA.REV.STAT.ANN. § 17:1943(2)(West Supp. 1998). We will note any provisions of the special education statute that have been amended since the time of trial and whether those amendments have any bearing on the questions before us.

3

secondary school structures of the state, specifically designed to provide for different learning styles of exceptional children." LA.REV.STAT.ANN. § 17:1943(4)(West Supp. 1998). Special education programs are administered by the State Department of Education ("the Department") at the state level, and by parish or city school boards at the parish or city levels; at those lower levels, the Department provides "only general supervision and monitoring." LA.REV.STAT.ANN. § 17:1944(A)(1)(West Supp. 1998).[3]

The district court found that state funds for special education programs are allocated to the Jefferson Parish Public School System ("JPPSS") "based on the number of exceptional children served by employees of the local school board, consistent with state-required pupil/teacher ratios for the provision of services to students with particular exceptionalities." Helms, 856 F.Supp. at 1110. The court also found that "[t]he public school system receives federal monies based on the 'child count' of special education students enrolled at both public and nonpublic schools." Id.

The Department or city/parish school boards are authorized to "enter into a purchase of services agreement with any other public or nonpublic school, agency or institution to provide free appropriate education to exceptional children in need of special

---

[3]Additionally, the office of special education services within the Department provides "general supervision and monitoring of all education programs for exceptional children conducted within the state." LA.REV.STAT.ANN. § 17:1944(A)(2)(West Supp. 1998).

4

education and related services...."  LA.REV.STAT.ANN. § 17:1949-50 (West 1982).  Pursuant to that authority, the Jefferson Parish School Board ("JPSB") contracted with the Special Education Services Corporation ("SESC") to provide special education services by public school teachers at private schools operated under the authority of the Archdiocese of New Orleans.[4]  The district court found that at the time of trial the sole employee of SESC  (its executive director Jan Janz) was also a paid employee of the Office of Special Education for the Archdiocese of New Orleans; additionally, the members of the SESC were

> [t]he respective Presidents of the Archdiocesan School Board and Diocesan School Board of the Roman Catholic Archdiocese of New Orleans, and the Roman Catholic Diocese of Lafayette, Baton Rouge, Houma-Thibodeaux, and Lake Charles, and a representative to be appointed by the Bishop of the Diocese of Alexandria-Shreveport, respectively.

Helms, 856 F.Supp. at 1108.  The court thus concluded that SESC was a "religiously-affiliated corporation."  Id.

The availability of special education services on the premises of nonpublic schools in Jefferson Parish caused a "dramatic escalation of requests for special-education teachers and aides by

---

[4]SESC was established as a Louisiana nonprofit corporation in 1981.  It was organized for the purpose of "assist[ing] students who are having academic and behavior problems  to cope in the school environment."  Although SESC was originally funded with $1.65 million by the 1982 Legislature, the district court found that since at least 1987, SESC has not received any funds from the State of Louisiana or any other governmental body.  See Helms, 856 F.Supp. at 1108.

5

the approved nonpublic schools...." Helms, 856 F.Supp. at 1108. Wary that such a trend might funnel off too many students and teachers to private schools, in 1982 the JPSB formed a committee comprised of its staff and staff from the Archdiocese of New Orleans to study the problem. The committee issued a report recommending, *inter alia*, (1) that state funding for teachers and aides working in nonpublic schools be capped at its 1982-83 levels (excluding teachers covered under the contractual agreement for 1982-83 with SESC); (2) that, beginning with the 1983-84 academic year, "the total local costs for any new positions or vacancies for teachers or teacher aides will be borne by the Catholic schools to which these persons are assigned"; and (3) that the Archdiocese would be able to establish new special education classes at its schools, but that "the total local costs ... [would] be the responsibility of the individual schools." Id. at 1109. The JPSB approved the report.

The JPSB/SESC contract for the 1989-90 school year provided that the JPSB would hire up to 14 special education teachers and up to 5 teacher assistants. These teachers and assistants were assigned to Chinchuba Institute for the Deaf and eight parochial schools.[5] Under the contract, the classrooms were to be provided

---

[5]The eight parochial schools were Immaculate Conception High School, Archbishop Rummel High School, St. Agnes Elementary School, St. Angela Elementary School, St. Benilde Elementary School, St. Christopher Elementary School, St. Francis Xavier Elementary School, and St. Mary Magdalen Elementary School.

by SESC at no cost to the JPSB. The special education programs conducted in those classrooms would be supervised by both the JPSB and the administrator of SESC.

Pursuant to the contract, SESC billed the JPSB for the cost of the special education teachers and teacher assistants provided to the nine nonpublic schools. For the fiscal year 1989-90, that cost was estimated to be approximately $149,583.00. The salary of a special education teacher, one facet of those costs, consists of (1) money from the "minimum foundation" program (i.e., money that comes to Jefferson Parish from the State); and (2) the local salary supplement. In the public schools, the JPSB pays the local salary supplement. By contrast, in the nonpublic schools the SESC agreed to pay the supplement. Since 1987, SESC has been funded by contributions from the participating nonpublic schools. The parents of special education students attending these nonpublic schools pay a supplemental fee to SESC, in addition to tuition they would normally pay. See Helms, 856 F.Supp. at 1117.

Jefferson Parish special education teachers in both public and nonpublic schools are subject to the same Collective Bargaining Agreement. A clause in the 1989-90 agreement states that "[p]ositions in special education classes which are provided in nonpublic schools and are a duplication of services provided by the Jefferson Parish Public School System shall be filled *only after* all special education positions in the Jefferson Parish Public

7

School System have been filled by certified special education teachers." See Helms, 856 F.Supp. at 1110 (emphasis added). Notably, however, an exception to that clause states that "[t]he Board shall not involuntarily transfer special education teachers assigned to nonpublic schools prior to the 1983-84 school session unless pupil-teacher ratio changes reduce teacher needs." Id. at 1110-11. The district court found that this exception functions as a "compromise agreement involving public school teachers providing special education services at nonpublic schools." Id. at 1111 (internal quotes omitted). Twelve of the fourteen special education teachers currently employed by the Jefferson Parish Public School System and providing services at nonpublic schools are there by reason of the exception in the Collective Bargaining Agreement ("the grandfather provision"). Id.

Pursuant to State regulations, the JPSB and SESC entered into an "interagency agreement," to be effective for one year from July 1, 1989, the stated purpose of which was to "formalize the cooperation and to identify the responsibilities" of the two entities regarding the special education program. See Helms, 856 F.Supp. at 1113. The interagency agreement does not specifically provide for monitoring to determine whether the special education teacher engages in either religious discussion or conduct. The contract only provides that the principal of the nonpublic school "will ensure that the policies and procedures of the [JPSB] will be

8

followed in all areas of cooperative effort." Id.[6] The State, however, conducts inspections of randomly selected special education programs once every three years; these inspections include a thorough review of students' school records and interviews with teachers and principals. Id. at 1114.

The teaching responsibilities of each JPPSS special education teacher are described in the Individualized Education Program ("IEP") of each of the teacher's students. An IEP describes each child's entire special education curriculum. State regulations mandate that "[t]he responsibility for the development of each initial IEP rests with the [public] school system's special education supervisor." Helms, 856 F.Supp. at 1114. Religious instruction is not described in the IEP, nor do church or religious officials have any authority whatsoever over the content of the IEP. Id. Moreover, special education teachers must and do teach only what is outlined in the IEP. Id.

The district court specifically found that: "[t]he JPPSS special education teachers at nonpublic schools do not teach religion" Id.; "[t]he special education classrooms are used only for special education instruction" Id.; and that "JPPSS special education teachers at the eight Catholic schools are not required

---

[6]Nonpublic school principals are also contractually bound to "enforce, apply, and follow all [JPSB] personnel policies and procedures, including but not limited to the Collective Bargaining Agreement, the Teacher Evaluation Program, and the Teacher Assistant Evaluation Program, in the 'management and supervision of the teachers' employed by the JPPSS." Helms, 956 F.Supp. at 1114.

9

to attend any religious services."  Id.

Special education teachers teach in self-contained or resource classrooms within each Catholic school's facility.  JPPSS requires all special education classrooms to be "located in the center of the school" to make it easier for students to get to their classroom.  To that end, most classrooms are located in the main school building or on the main school campus.[7]  No sign or other special designation indicates that the special education classroom or area used is a public school classroom or area.  See Helms, 856 F.Supp. at 1115.

Nonpublic school principals may assign JPPSS special education teachers non-teaching custodial duties involving oversight of student safety and behavior -- such as lunch duty or bus duty -- only in a manner consistent with the Collective Bargaining Agreement.  Pursuant to that agreement, the special education teachers may also be required to attend faculty meetings no more frequently than once per month, for one hour.  See id. at 1114.

The JPSB/SESC contract states that "[t]eacher evaluation in the nonpublic schools falls under the auspices of the [JPPSS]; therefore, the nonpublic schools must follow all policies and procedures of the [JPPSS] governing teacher evaluation."  The contract also stipulates that in the nonpublic schools, principals

---

[7]The one noted exception is at St. Christopher's Elementary School, where the special education classroom is located in a portable unit.

10

and special education teachers shall participate in evaluation and special education policies and procedures. See id. at 1115. The principal of the nonpublic school is the "supervisor and 'formal evaluator' of the special education teachers in that school." See id. at 1117. The record indicates that the principal, through actual classroom observation of the special education teachers and through interviews, performs limited evaluations of the teachers' "teaching abilities" and "classroom management skills." The record also indicates the principal's supervisory role is strictly circumscribed by JPPSS. There is no evidence demonstrating that the principals have supervisory authority over the *content* of the special education program.

The district court made the following findings regarding Mary L. Cerise, a JPPSS special education teacher at St. Angela Merici. Prior to her employment as a special education teacher by JPPSS, Cerise was employed by St. Angela Merici for approximately ten years as an elementary education teacher. Now, however, she informs her students that she is a JPPSS employee; parents become aware of her employment when they sign the child's IEP. In testifying about her contacts with the principal at St. Angela Merici, Cerise indicated that "during the day he often walks in and out of the classrooms." Cerise also testified that the principal was her immediate supervisor in that "[h]is position is to see that [she] implement[s] the program as outlined on the [IEP] and that

11

[she is] carrying out the instructional objectives and trying to meet the needs of each child that is in [her] care." See Helms, 856 F.Supp. at 1116.

Prior to Cerise's tenure, an employee of JPPSS would regularly monitor Cerise's files and classroom activities at the school. Since her tenure, however, no state employee has monitored her classroom; instead, she writes down everything she does in the IEP, which is sent to an "IEP specialist" and then returned to her with accompanying commentary. The IEP specialist, Barbara Cavallino, a JPPSS employee, did not visit St. Angela Merici during the 1989-90 school year, but did visit once during the previous year. Cerise's contact with the IEP specialist is normally by telephone and occurs whenever she has an "academically or IEP-related" question that she wants clarified. See id.

In addition to the student report cards issued by the parochial school, Cerise must complete a progress report which is required by the JPPSS for every special education student. Cerise attends faculty meetings at St. Angela Merici on a monthly basis. She attended one general workshop for all special education teachers sponsored by the JPPSS at the beginning of the 1989-90 school year. See id.

Jan Janz, the sole employee and executive director of SESC, has "general supervision" of the special education program provided on nonpublic school premises by the JPSB/SESC contract. She visits the special education classrooms and monitors the evaluations and

12

the IEPs of the special education students that are on file. Janz testified that she did not specifically monitor for religious symbols in the special education classrooms, but that if she observed a religious symbol in the classrooms, she "would ask that they remove it." Barbara Turner Windhorst, the director of special education from June of 1982 to January of 1987, was not aware of any JPPSS policy which required the director of special education to observe whether religious symbols were present in the special education classrooms. She did not investigate for the presence of religious symbols, nor did she recall whether any religious symbols were present in the special education classrooms. The State of Louisiana has no policy that requires its employees to inspect the special education classrooms for such symbols. See id. at 1117.

JacLynn Welsch, a volunteer teacher's assistant to Jean Douglass (a JPPSS special education teacher also at St. Angela Merici), testified that Douglass taught special education classes to upper grades in a partially partitioned classroom. The classroom also serves as the special education room for another teacher. Welsch testified that there is a crucifix in the room. See id. at 1116.

The district court ended its fact-findings with the following conclusions:

> (1) "[S]pecial education teachers employed by the [JPSB] provide special education services on the premises of parochial schools";
>
> (2) "[T]here was no financial incentive for the parents of

13

special education students to choose a nonpublic school. In fact it is undisputed that the students would have received special education at no cost in the public schools. Instead, the parents of special education students elected to pay an extra charge, in addition to the regular tuition, in order for their children to attend a parochial school";

(3) "The State of Louisiana is presently disbursing funds to Jefferson Parish to provide special education services to all qualified children in Jefferson Parish, whether they attend public or nonpublic schools";

(4) "[N]o state, federal, or Jefferson Parish funds are paid directly to SESC or to the parochial schools. Rather, SESC contributes monies to the [JPSB] to help pay for the salaries of the JPPSS special education teachers located at the parochial schools. SESC receives its monies from the individual schools providing the special education services";

(5) "[T]he parochial schools have received a direct economic benefit by furnishing special education services on their premises. The parochial schools receive tuition and a special education surcharge from the special education students, yet they are not responsible for the full salaries of the JPPSS special education teachers. The JPPSS special education teachers are paid by the [JPSB] with funds primarily obtained from the State of Louisiana and supplemented by the parochial schools through SESC";

(6) "[I]f the special education services were not provided at the nonpublic schools, those special education students would be compelled to attend public schools which provide the necessary services at no charge to the parents. Thus, the nonpublic schools would be deprived of an economic benefit, that is, the tuition and the special education surcharge received from the special education students."

Helms, 856 F.Supp. at 1117-18.

B.

The district court began its conclusions of law by holding that the eight Catholic schools at issue here are "pervasively sectarian." Helms, 956 F.Supp. at 1118, quoting Bowen v. Kendrick,

14

487 U.S. 589, 610 (1988).  Regarding the familiar three-part test of <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971), the court observed that "even though *Lemon* has not been overruled, its continuing vitality appears to be in question."  <u>Helms</u>, 856 F.Supp. at 1118, <u>citing</u> <u>Lamb's Chapel v. Center Moriches Union Free School Dist.</u>, 113 S.Ct. 2141, 2148 n.7 (1993).

Thus, the court relied primarily on the analysis used in the Supreme Court's (then) most-recent Establishment Clause case, <u>Zobrest v. Catalina Foothills School Dist.</u>, 509 U.S. 1 (1993).  <u>Zobrest</u> held that the Establishment Clause does not bar a school district from furnishing an exceptional child with a sign-language interpreter at a parochial school "in order to facilitate his education."  <u>Zobrest</u>, 509 U.S. at 14.  The district court followed the <u>Zobrest</u> analysis and asked whether the Louisiana special education program, as applied in Jefferson Parish, more closely resembled the school aid programs found constitutional in <u>Mueller v. Allen</u>, 463 U.S. 388 (1983), and <u>Witters v. Washington Dep't of Services for the Blind</u>, 474 U.S. 481 (1986), or instead more closely resembled the school aid programs struck down in <u>Meek v. Pittenger</u>, 421 U.S. 349 (1975), and <u>School Dist. of Grand Rapids v. Ball</u>, 473 U.S. 373 (1985).  <u>See</u> <u>Helms</u>, 856 F.Supp. at 1118-19, <u>citing</u> <u>Zobrest</u>, 509 U.S. at 7-14.

Ultimately, the court found that "the situation in the instant case more closely resembles *Meek* and *Ball*, rather than *Mueller* and

15

*Witters*." Helms, 856 F.Supp. at 1120-21. In the court's view, the provision of special education services on parochial school premises, where the teachers are paid by a combination of State and SESC funds, amounted to "assistance ... given directly to the schools themselves, and not indirectly through the parents or students." Id. Quoting from Meek, the court thus concluded that the JPPSS special education teachers were "performing educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." Id. at 1121, quoting Meek, 421 U.S. at 371. Further, the court found that the continuing surveillance necessary to insure that teachers would not inculcate religion "could result in administrative entanglement between the parochial schools and the State and Jefferson Parish." Helms, 856 F.Supp. at 1121, citing Meek, 421 U.S. at 372. Consequently, the court felt itself "compelled to find that the special education statute, LA.REV.STAT.ANN. §§ 17:1941-1956, which allows state-paid teachers to teach on the premises of pervasively sectarian institutions, violates the Establishment Clause as applied." Helms, 856 F.Supp. at 1121.

C.

1.

When we view the deceptively simple words of the Establishment

16

Clause[8] through the prism of the Supreme Court cases interpreting them, the view is not crystal clear.  Indeed, when the Supreme Court itself admits that it "can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law," as a Circuit Court bound by the High Court's commandments we must proceed in fear and trembling.  See Lemon, 403 U.S. at 612, quoted with approval in Mueller, 463 U.S. at 393, and Committee for Public Education v. Nyquist, 413 U.S. 756, 761 (1973).

That said, we begin by observing that the Supreme Court's most recent sermon in this area, Agostini v. Felton, 117 S.Ct. 1997 (1997), which was not available to the district court, must control the outcome here, as it presents a factual situation closely analogous to our own.  See discussion infra.  Agostini overruled a portion of Ball, supra, a case on which the district court relied.  See Agostini, 117 S.Ct. at 2016, overruling Aquilar v. Felton, 473 U.S. 402 (1985), and overruling in part Ball, 473 U.S. 373 (1985).  The crucial question before us is whether Agostini mandates a different result than that reached by the district court.  We hold that it does.

Agostini considered the constitutionality of Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 27, as modified, 20 U.S.C. § 6301 et seq. ("Title I").  Title I channels

---

[8]"Congress shall make no law respecting an establishment of religion...."  U.S. CONST. amend. I.

federal funds, through the States, to "Local Educational Agencies" ("LEAs"), which in turn spend the funds to provide remedial education, guidance and job counseling to eligible students.  <u>See</u> <u>Agostini</u>, 117 S.Ct at 2003.  An eligible student is one who resides within the attendance boundaries of a school located in a low-income area and who is failing, or is at risk of failing, the State's student performance standards.  <u>Id</u>. at 2003-04.  Title I requires that funds be made available equitably to all eligible children, whether they attend public or private schools.  <u>Id</u>. at 2004.

When an LEA provides Title I services to children attending private schools, those services are subject to heightened constraints.  For example, Title I services may be provided only to *eligible* private school students and, unlike at public schools, those services therefore cannot be provided on a "school-wide" basis.  <u>See</u> <u>id</u>.  Additionally, the LEA must retain complete control over Title I funds and must retain title to all materials used in conjunction with Title I services.  <u>Id</u>.  The LEA also must provide those services through public employees or other persons independent of the private school and any religious institution.  <u>Id</u>.  Importantly, the Title I services themselves must be "secular, neutral, and nonideological," and must "supplement, and in no case supplant, the level of services" already provided by the private school.  <u>Id</u>.

18

The LEA in Agostini, the Board of Education of the City of New York, struggled for over a decade attempting to provide Title I services to private school students within its jurisdiction. See Agostini, 117 S.Ct. at 2004. After unsuccessful experiments involving the off-campus provision of services, the Board of Education implemented the plan that invoked the wrath of the Agostini plaintiffs:

> That plan called for the provision of Title I services on private school premises during school hours. Under the plan, only public employees could serve as Title I instructors and counselors. Assignments to private schools were made on a voluntary basis and without regard to the religious affiliation of the employee or the wishes of the private school. [A] large majority of Title I teachers worked in nonpublic schools with religious affiliations different from their own. The vast majority of Title I teachers also moved among the private schools, spending fewer than five days a week at the same school.

Agostini, 117 S.Ct. at 2004 (citations omitted). As an additional safeguard, public employees providing Title I services on private school premises "would be given a detailed set of written and oral instructions emphasizing the secular purpose of Title I and setting out the rules to be followed to ensure that this purpose was not compromised." Id. Consultations with a student's regular classroom teacher were limited to "mutual professional concerns regarding the student's education." Id. at 2005. Finally, "a publicly employed field supervisor was to attempt to make at least one unannounced visit to each teacher's classroom every month."

19

<u>Id</u>.

In 1987 six federal taxpayers sued claiming that the Board's Title I program violated the Establishment Clause. At the conclusion of the dispute's first lap through the Federal court system, the Supreme Court affirmed the decision of the Second Circuit, holding that the program was unconstitutional because it "necessitated an 'excessive entanglement of church and state in the administration of [Title I] benefits.'" <u>Agostini</u>, 117 S.Ct. at 2005, <u>quoting</u> <u>Aguilar</u>, 473 U.S. at 414. Consequently, on remand the district court permanently enjoined the Board of Education from allowing State-funded "public school teachers and guidance counselors to provide teaching services on the premises of sectarian schools within New York City." <u>Agostini</u>, 117 S.Ct. at 2005.

In 1995, the Board, together with a group of parents of parochial school children entitled to Title I services, moved the district court under Federal Rule of Civil Procedure 60(b), seeking relief from the permanent injunction on the grounds that the "decisional law [had] changed to make legal what the [injunction] was designed to prevent." <u>Id</u>. at 2006, <u>quoting</u> <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367, 388 (1992). Both the district court and the Second Circuit denied relief, but the Supreme Court reversed and vacated the injunction. <u>Agostini</u>, 117 S.Ct. at 2019.

The central question before the Court in <u>Agostini</u> was "whether <u>Aguilar</u> [had] been eroded by [the Court's] subsequent Establishment

20

Clause cases." Id. at 2008. To answer it, the Court first had to

discuss the underpinnings of Aquilar and its companion case, Ball:

> Distilled to essentials, the Court's conclusion that the Shared Time program in Ball had the impermissible effect of advancing religion rested on three assumptions: (i) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work; (ii) the presence of public employees on private school premises creates a symbolic union between church and state; and, (iii) any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decisionmaking. Additionally, in Aquilar there was a fourth assumption: that New York City's Title I program necessitated an excessive entanglement with religion because public employees who teach on the premises of religious schools must be closely monitored to ensure that they do not inculcate religion.

Agostini, 117 S.Ct. at 2010. The Court then proceeded to

demonstrate how its intervening decisions had "undermined the

assumptions upon which Ball and Aquilar relied." Id.

While the Court reaffirmed the bedrock principle that

"government inculcation of religious beliefs has the impermissible

effect of advancing religion," the Court found that cases

subsequent to Aquilar had "modified in two significant respects the

approach [it] use[s] to assess indoctrination." Agostini, 117

S.Ct. at 2010. The first sea-change the Court noted in its

indoctrination analysis was that it had:

> abandoned the presumption erected in Meek and Ball that the placement of public school

21

> employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion.

Id., citing Zobrest, 509 U.S. at 13.  No longer, then, would a public employee on sectarian school property "be presumed to inculcate religion in the students," without evidence to the contrary.  Agostini, 117 S.Ct. at 2011;  see also id. at 2012 ("Certainly, no evidence has ever shown that any New York City Title I instructor teaching on parochial school premises attempted to inculcate religion in students.").  Nor would the mere presence of a public employee on the premises of a religious school "create[] an impermissible 'symbolic link' between government and religion."  Id. at 2011.  The Court thus demolished with one swift stroke the first two assumptions upon which Ball had stood.  See id. at 2010.

The second "significant" alteration the Court noted was that it had "departed from the rule relied on in Ball that *all* government aid that directly aids the educational function of religious schools is invalid."  Id. at 2011 (emphasis added).  The Court, however, was somewhat cryptic about how one might distinguish between valid and invalid government aid that "directly aids the religious function of religious schools."  From the Court's reliance on Zobrest, supra, and also on Witters v. Washington Dept. of Services for the Blind, 474 U.S. 481 (1986),

22

however, we can glean the kinds of requirements the Court might demand of such aid. First, it was crucial in the Court's view that any aid be *neutral* -- that is, that any aid be "made available generally without regard to the sectarian-nonsectarian, public-nonpublic nature of the institution benefited." Agostini, 117 S.Ct. at 2011, quoting Witters, 474 U.S. at 487. Second, the Court required that "any money that ultimately went to religious institutions did so 'only as a result of the genuinely independent and private choices of' individuals." Agostini, 117 S.Ct. at 2011-12, quoting Witters, 474 U.S. at 487. Relative to the second requirement, the Court noted that an aid program's eligibility criteria may ensure that the aid flows to sectarian institutions only as a "result of the private decision of individual parents" (i.e., if the aid is given based on factors unrelated to religion, the fact that some aid is channeled to religious schools is a function of the parents' decision to send their children to such schools and therefore "[can] not be attributed to state decisionmaking."). Agostini, 117 S.Ct. at 2012, citing Zobrest, 509 U.S. at 10. Finally, the aid cannot "indirectly finance religious education by 'reliev[ing] the sectarian schoo[l] of costs [it] otherwise would have borne in educating [its] students." Agostini, 117 S.Ct. at 2012, citing Zobrest, 509 U.S. at 12.[9]

---

[9]The Court also observed that whether the aid is provided to one student, as it was in Zobrest, or to several students at once, as it was in Agostini, "is not constitutionally significant." Agostini, 117 S.Ct. at 2013.

The criteria by which an aid program identifies its beneficiaries may, in the Court's view, advance religion in another way: "the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination." Agostini, 117 S.Ct. at 2014, citing Witters, 474 U.S. at 488, and Zobrest, 509 U.S. at 10. The Court provided a test for determining whether aid criteria create such an incentive:

> This incentive is not present, however, when the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion.

Agostini, 117 S.Ct. at 2014, citing Widmar v. Vincent, 454 U.S. 263 (1981). When assessing whether an aid program has the impermissible effect of advancing religion, then, the criteria by which that aid is allocated are relevant in two distinct ways: whether any use of the aid to indoctrinate religion can be attributed to the state, and, whether the criteria themselves create a financial incentive to undertake religious indoctrination. See Agostini, 117 S.Ct. at 2014.

The Court in Agostini expressly treated the "entanglement" prong (often regarded as the third prong -- see, e.g., Mueller, 463 U.S. at 394) of the *Lemon* test as "an aspect of the inquiry into a statute's effect." Agostini, 117 S.Ct. at 2015, citing Walz v. Tax Comm'n of the City of New York, 397 U.S. 664, 674 (1970). The

24

Court did so observing that, regardless how it had characterized the "entanglement" inquiry in prior cases, "the factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect.'" Agostini, 117 S.Ct. at 2015. Those factors include (1) "the character and purposes of the institutions benefited," (2) "the nature of the aid that the State provides," and, (3) "the resulting relationship between the government and religious authority." Id.

The Court emphasized that not every entanglement between government and religion offends the Constitution:

> Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause.

Agostini, 117 S.Ct. at 2015 (citations omitted). The Aquilar Court found that the Board's Title I program fostered excessive entanglement for three reasons: (1) "the program would require pervasive monitoring by public employees to ensure that Title I employees did not inculcate religion"; (2) "the program required administrative cooperation between the Board and parochial schools"; and, (3) "the program might increase the dangers of political divisiveness." Id., citing Aquilar, 473 U.S. at 413-14 (internal quotes omitted). The Agostini Court began, however, by observing that the last two grounds cannot, in and of themselves, create an excessive entanglement, since "[t]hey are present no

25

matter where Title I services are offered, and no court has held that Title I services cannot be offered off-campus." Agostini, 117 S.Ct. at 2015.

More importantly, the Court remarked that, since it had abandoned the assumption that public employees on sectarian school premises will inevitably inculcate religion,

> we must also discard the assumption that pervasive monitoring of Title I teachers is required. There is no suggestion *in the record before us* that unannounced monthly visits of public supervisors are insufficient to prevent or to detect inculcation of religion by public employees. Moreover, we have not found excessive entanglement in cases in which States imposed far more onerous burdens on religious institutions than the monitoring system at issue here.

Agostini, 117 S.Ct. at 2016, referring to Bowen, 487 U.S. at 615-17 (emphasis added). Thus, the Court will now require evidence demonstrating the insufficiency of a particular monitoring system before it will conclude that public teachers on parochial school grounds are impermissibly inculcating religion.

The Court concluded with the following language:

> To summarize, New York City's Title I program does not run afoul of any of the three criteria we currently use to evaluate whether government aid has the effect of advancing religion: it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement.

Agostini, 117 S.Ct. at 2016. The Court then stated its holding:

> We therefore hold that a federally funded

26

> program providing supplemental, remedial instruction to disadvantaged children on a neutral basis is not invalid under the Establishment Clause when such instruction is given on the premises of sectarian schools by government employees pursuant to a program containing safeguards such as those present here. The same considerations that justify this holding require us to conclude that this carefully constrained program also cannot reasonably be viewed as an endorsement of religion. Accordingly, we must acknowledge that <u>Aguilar</u>, *as well as the portion of <u>Ball</u> addressing Grand Rapids' Shared Time program*, are no longer good law.

<u>Id</u> (emphasis added).

### 2.

For our purposes, <u>Agostini</u> is as important for what it did *not* hold as for what it did. As the emphasized language at the end of the last section shows, <u>Agostini</u> only overruled that part of <u>Ball</u> dealing with the Shared Time program. <u>See also</u> <u>Agostini</u>, 117 S.Ct. at 2016 ("...overruling <u>Aguilar</u> and those portions of <u>Ball</u> inconsistent with our more recent decisions."). <u>Agostini</u> explicitly left intact that part of <u>Ball</u> which struck down the Community Education program. <u>See</u> <u>id</u>.; <u>see also</u> <u>Agostini</u>, 117 S.Ct. at 2019 n.1 (Souter, J., dissenting). We believe that contrasting the two programs in <u>Ball</u> will further illuminate the meaning of <u>Agostini</u>, for while the Shared Time program is constitutional under <u>Agostini</u>, presumably the Community Education program is not.

The Shared Time program offered classes during the regular schooldays that were "supplementary" to State-required core

27

curriculum courses.[10]  See Ball, 473 U.S. at 375.  By contrast, the Community Education program offered courses to children and adults that commenced after the regular schooldays.  Id. at 376.[11]  Courses offered included Arts and Crafts, Home Economics, Spanish, Gymnastics, Yearbook Production, Christmas Arts and Crafts, Drama, Newspaper, Humanities, Chess, Model Building, and Nature Appreciation.  Id. at 376-77.  The Court did not indicate that the Community Education courses were intended to be "supplementary" to core curriculum subjects.  There was evidence  that both Shared Time and Community Education courses taught at nonpublic schools were also available, perhaps in a different format, in public schools.  Id.

The Ball Court noted that "[b]oth programs [were] administered similarly."  Id. at 377.  For example, nonpublic school administrators decided which courses to offer, based on a list of courses provided by the Director of the program, a public school employee.  Id.  Nonpublic administrators also decided which classrooms would be used for the programs, subject to inspection of the facilities by the same Director.  Id.  The public school system "leased" the classrooms from the nonpublic schools for a nominal

---

[10]For example, the Shared Time program offers courses such as "remedial" and "enrichment" mathematics, reading, art, music, and physical education.  Id.

[11]The appeal in Ball "involved only Shared Time classes at the elementary level, Community Education classes at the elementary level, and the remedial mathematics Shared Time Program at the secondary level."  Id. at 376 n.1.

28

weekly charge.  Id.  The leased classrooms had to be free of any religious symbols, although religious symbols "[could] be present in the adjoining hallways, corridors, and other facilities used in connection with the program."  Id. at 378.  The program teacher was required to post a sign outside the classroom stating that it was a "public school classroom."  Id.

The most important difference between the two programs was the status of their teachers.  See id. at 387.  The Shared Time teachers were "full-time employees of the public schools."  Id. at 376.  In stark contrast,

> Community Education teachers are part-time public school employees. (...) Because a well-known teacher is necessary to attract the requisite number of students, the School District accords a preference in hiring to instructors *already teaching within the school*.  *Thus, virtually every Community education course conducted on facilities leased from nonpublic schools has an instructor otherwise employed full time by the same nonpublic school*.

Ball, 473 U.S. at 377 (emphasis added).  While it is true that approximately 10% of the Shared Time teachers "previously taught in nonpublic schools, and many of those had been assigned to the same nonpublic school where they were previously employed," no Shared Time teachers were *concurrent* employees of both the nonpublic schools and the public school system.  See id. at 376.

Although the Ball majority invalidated *both* programs, its discussion of the Community Education program focused on the dual

29

roles of that program's teachers:

> These [Community Education] instructors, many of whom no doubt teach in the religious school precisely because they are adherents of the controlling denomination and want to serve their religious community zealously, are expected during the regular schooldays to inculcate their students with the tenets and beliefs of their particular religious faiths. Yet the premise of the [Community Education] program is that those instructors can put aside their religious convictions and engage in entirely secular Community Education instruction as soon as the schooldays is over. Moreover, they are expected to do so before the same religious school students and in the same religious school classrooms that they employed to advance religious purposes during the "official" schooldays. Nonetheless, as petitioners themselves asserted, Community Education classes are not specifically monitored for religious content.

Ball, 473 U.S. at 386-87. Given the "conflict of functions inhere[nt] in the situation," the Court found "a substantial risk that, overtly or subtly, the religious message [the teachers] are expected to convey during the regular schooldays will infuse the supposedly secular classes they teach after school." Id. at 387, in part quoting Lemon, 403 U.S. at 618-19. The Court was careful not to impugn the integrity of the Community Education teachers, but it nonetheless found a substantial risk of inculcation "because the pressures of the environment might alter [their] behavior from its normal course." Ball, 473 U.S. at 387, citing Wolman v. Walter, 433 U.S. 229, 247 (1977).

The Ball Court also found a "substantial risk of state-sponsored indoctrination" in the Shared Time program. Ball, 473

30

U.S. at 387. Notably, however, the Court did so by indulging in an assumption that the Agostini Court has now expressly disavowed -- i.e., the assumption that public employees teaching on the premises of sectarian schools "may well subtly (or overtly) conform their instruction to the environment in which they teach...." Id. at 388. The quoted language encapsulates what the Agostini court identified as the first of three now-abandoned assumptions on which Ball relied. See Agostini, 117 S.Ct. at 2010; see also discussion supra Part II.C.1. By contrast, the Court invalidated the Community Education program, *not* because of any unfounded assumptions about public employees' behavior, but instead because of the genuine "conflict of functions" present when a teacher must fill two mutually-exclusive roles in the course of a single schoolday. See Ball, 473 U.S. at 387.

A few other aspects of Ball bear noting. First, the Court gave no weight to whether the courses offered by either program were "supplemental." Even if the courses offered were, as a matter of fact, "supplemental" insofar as they were not then offered by the nonpublic school, the Court observed that "there is no way of knowing whether the religious schools would have offered some or all of these courses if the public school system had not offered them first." Id. at 396. Instead of focusing on the "remedial" or "enrichment" aspects of the courses, the Court looked more broadly to their "general subject matter" (reading, mathematics, etc.),

31

which was "surely a part of the curriculum in the past...." <u>Id</u>. Thus, "the concerns of the Establishment Clause may ... be triggered despite the 'supplemental' nature of the courses." <u>Id</u>.

Second, the Court noted that "respondents adduced no evidence of specific incidents of religious indoctrination in this case." <u>Id</u>. at 388. Nonetheless, the Court frankly observed that "the absence of proof of specific incidents is not dispositive," because neither the religious schools nor the teachers, parents and students would have any incentive "to complain if the effect of the publicly supported instruction were to advance the schools' sectarian mission." <u>Id</u>. at 388-89. The Court had earlier noted that neither the Community Education nor the Shared Time program was monitored for religious content. <u>See</u> <u>id</u>. at 387.

Finally, we think it especially noteworthy that Justice O'Connor (the author of <u>Agostini</u>) and (then) Chief Justice Burger dissented in <u>Ball</u>, *but only as to the Shared Time program*. Both invalidated the Community Education program. <u>See</u> <u>Ball</u>, 473 U.S. at 398 (Burger, C.J., concurring in the judgment in part and dissenting in part), <u>and</u> 473 U.S. at 398-400 (O'Connor, J., concurring in the judgment in part and dissenting in part). Because Justice O'Connor gave specific reasons for distinguishing the two programs, we reproduce here the final paragraph of her partial concurrence:

> I agree with the Court, however, that the Community Education program violates the

32

Establishment Clause. The record indicates that Community Education courses in the parochial schools are overwhelmingly taught by instructors who are current full-time employees of the parochial school. The teachers offer secular subjects to the same parochial school students who attend their regular parochial school classes. In addition, the supervisors of the Community Education program in the parochial schools are by and large the principals of the very schools where the classes are offered. When full-time parochial school teachers receive public funds to teach secular courses to their parochial school students under parochial school supervision, I agree that the program has the perceived and actual effect of advancing the religious aims of the church-related schools. This is particularly the case where, as here, religion pervades the curriculum and the teachers are accustomed to bring religion to play in everything they teach. I concur in the judgment of the Court that the Community Education program violates the Establishment Clause.

Id. at 398-400 (O'Connor, J., concurring in the judgment in part and dissenting in part).

D.

Having in some degree clarified the legal principles governing our discussion, we now apply them to the Louisiana special education program, as administered in Jefferson Parish. Naturally, we walk within the path recently marked out in Agostini. At the same time, however, we are mindful that this is an area of constitutional law that is not blessed with easy answers. The most concrete tools at our disposal are the actual school aid programs the Supreme Court has either validated or invalidated. Thus, although we apply the analysis of Agostini, our ultimate goal is to

33

determine whether the Louisiana special education statute is more like the constitutional aid programs approved by <u>Agostini</u> (i.e., the New York City program and the Grand Rapids Shared Time program) or more like the unconstitutional program condemned by <u>Ball</u> (the Community Education program). <u>See, e.g.</u>, <u>Mueller</u>, 463 U.S. at 393-94 (employing a similarly "comparative" analysis).

As we read <u>Agostini</u>, the Supreme Court has not abandoned, nor even fundamentally changed, the *Lemon* test. <u>See</u> <u>Agostini</u>, 117 S.Ct. at 2010 ("To be sure, the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed since <u>Aguilar</u> was decided."). The first prong of *Lemon*, which asks whether a statute has a secular legislative purpose, remains unchanged. <u>See</u> <u>Lemon</u>, 403 U.S. at 612-13. The Court has, however, somewhat altered its "understanding of the criteria used to assess whether aid to religion has an impermissible effect." <u>Id</u>. Specifically, the Court has abandoned three of the assumptions which underlay the second ("effects") prong of *Lemon* in prior cases. <u>Id</u>.; <u>see also</u> discussion <u>supra</u> Part II.C.1. The Court has also expressly recognized that the third ("entanglement") prong of *Lemon* is more properly addressed as an aspect of the "effects" prong. <u>Agostini</u>, 117 S.Ct. at 2015. It thus seems that, fairly restated, the post-<u>Agostini</u> *Lemon* test includes the first ("secular purpose") prong plus the following, re-tooled "effects" prong:

34

> [T]he three criteria we currently use to evaluate whether government aid has the effect of advancing religion: [does the aid] result in governmental indoctrination[?]; [does the aid] define its recipients by reference to religion[?]; or [does the aid] create an excessive entanglement[?]

Agostini, 117 S.Ct. at 2016 (brackets added).

1.

The Supreme Court has consistently found that even those State laws that run afoul of other aspects of *Lemon* may nonetheless have a "secular legislative purpose." See Mueller, 463 U.S. at 394. Following the Court's lead, then, we will exhibit a "reluctance [in] attribut[ing] unconstitutional motives" to the State of Louisiana as we examine whether "a plausible secular purpose for the state's program may be discerned from the face of the statute." Id. at 394-95.

We need not look far. The avowed purpose of the special education statute is "to assure and require that the state shall fund a program of special education and related services for the exceptional children of the state." LA.REV.STAT.ANN. § 17:1942 (West 1982). Nothing on the face of the statute belies the Legislature's purely secular aims in enacting it. Indeed, one of the public policies announced in the statute is to "prevent denials of equal educational opportunities on the basis of national origin, sex, economic status, race, *religion*, and physical or mental handicap or other exceptionalities in the provision of appropriate,

35

free publicly supported education." LA.REV.STAT.ANN. § 17:1941 (West 1982)(emphasis added). We find that the equitable provision of special education services to exceptional children is a "secular legislative purpose" under *Lemon*. See, e.g., Witters, 474 U.S. at 485-86.

2.

The government may not participate in the indoctrination of religion, because such government activity "has the impermissible effect of advancing religion." Agostini, 117 S.Ct. at 2010; see Lemon, 403 U.S. at 612. It is as easy to agree with such a proposition in the abstract as it is difficult to apply it to a particular governmental program. The Lemon Court itself remarked that "the line of separation [between church and state], far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on the circumstances of a particular relationship." Lemon, 403 U.S. at 614.

a.

Regarding indoctrination, Agostini first instructs us that the mere presence of a publicly paid teacher on sectarian school premises will no longer give rise to the presumption that those teachers will inculcate religion in their students. See Agostini, 117 S.Ct. at 2011. The record in this case discloses no evidence whatsoever that any of the special education teachers at the eight Jefferson Parish parochial schools have ever attempted to

36

indoctrinate their students. The special education teachers are bound by law to teach only what is included in a student's IEP, and an IEP cannot describe religious instruction. We will not presume that qualified, conscientious state employees are violating the law.

The employment status of these special education teachers falls somewhere between the Title I instructors in Agostini and the Community Education teachers in Ball. The Jefferson Parish special education teachers are full-time *public* employees who are not concurrently employed by the parochial schools where they work. Thus, they do not suffer from the "conflict of functions" present in the Community Education teachers in Ball. See Ball, 473 U.S. at 387. Unlike the Agostini teachers, however, the Jefferson Parish teachers are, in a sense, "permanently" assigned to their respective parochial schools under the terms of the Collective Bargaining Agreement. The Jefferson Parish teachers do not move from school to school, as the Agostini teachers do, and many of the Jefferson Parish teachers share the religious affiliation of their schools. See Agostini, 117 S.Ct. at 2004. We observe, however, that the Shared Time teachers in Ball were, in a significant number of cases, former employees of the schools at which they subsequently worked as State-paid teachers. See Ball, 473 U.S. at 376.

Naturally, the Jefferson Parish special education teachers

have frequent contacts with their fellow sectarian teachers and the sectarian principals. The special education teacher may even consider him or herself an informal member of the parochial faculty, as evidenced by the fact that special education teachers attend monthly faculty meetings. But, while admitting that we strike a fine balance, we do not find that the Jefferson Parish special education teachers labor under the same, irreconcilable "conflict of functions" that spelled doom for the Community Education program in Ball, supra. The Jefferson Parish teachers are simply not asked to act in the capacity of a "religious school" teacher during one part of the day, and then to assume the purely secular role of a publicly-funded special education teacher during another.

We are somewhat troubled by the evidence indicating that the special education teachers are monitored by *both* public and sectarian entities. The record shows that special education teachers are subject to infrequent visits by state personnel and are otherwise subject to the regular, albeit non-personal, supervision of state IEP specialists. The record also shows, however, that SESC executive director Janz as well as the parochial school principals exercise some level of supervision over the special education teachers.

If the State delegated its supervisory authority over the special education program to the sectarian schools themselves, or

38

to a sectarian institution such as the SESC, then the program might not withstand scrutiny under the Establishment Clause. See, e.g., Wolman v. Walter, 433 U.S. 229, 252-55 (1977). We are not persuaded, however, that the State has abdicated its review of the *substance* of the special education instruction to the sectarian institutions. While the record does show limited supervision of the teachers by the SESC and the parochial school principals, that supervision seems more related to administrative matters than to assuring that the special education teachers do not impart religion to the students. The State, through its monitoring visits and through the IEP process, has retained sufficient authority over the *substantive* aspects of the special education instruction.

Agostini also instructs us that the mere presence of a publicly-paid teacher on religious school premises will no longer "create[] an impermissible 'symbolic link' between government and religion." Agostini, 117 S.Ct. at 2011. We need not long belabor this point, because the record discloses no evidence that the special education program has done anything more than place its teachers on sectarian school premises.[12] The fact that many of the

---

[12]While we certainly do not place our imprimatur on the presence of religious symbols in state-funded special education classrooms, the evidence indicating the presence, *in one instance*, of a crucifix in a classroom is insufficient to show that the Jefferson Parish special education program has created a "symbolic link" between church and state. Other evidence indicates that program monitors would remove such a symbol if they found it in a classroom, even though the State of Louisiana does not have an articulated policy requiring inspection for, and removal of,

teachers were formerly employed by the same schools is insufficient to create a "symbolic link" between church and state, given that many of the Shared Time teachers in <u>Ball</u> shared a similar employment history. <u>See Ball</u>, 473 U.S. at 376. Our view is not altered by the fact that the special education teachers have limited "administrative ties" to the parochial schools -- i.e., they attend monthly faculty meetings; they can be assigned bus duty or lunch duty; etc. If the Supreme Court found it neither "sensible" nor "sound" to make a program's constitutionality depend on where services were provided, we find it equally nonsensical and unsound to make its constitutionality turn on whether state-paid teachers attend faculty meetings or perform lunch duty. <u>See</u> <u>Agostini</u>, 117 S.Ct. at 2012.

Finally, <u>Agostini</u> informs us that not *every* form of government aid that "directly aids the educational function of religious schools is invalid." <u>Id</u>. at 2011. In distinguishing between valid and invalid direct aid, we look, *per* <u>Agostini</u>, to the criteria for distributing the aid and for identifying its beneficiaries, the means by which any of the aid might potentially benefit religious schools, and whether the aid "relieve[s] sectarian schools of costs they otherwise would have borne in educating their students." <u>Id</u>. at 2012, <u>citing</u> <u>Zobrest</u>, 509 U.S. at 12. As discussed before, the district court found that State funds are awarded to Jefferson

---

religious symbols from public classrooms.

Parish based on the number of exceptional students there. See discussion supra Part II.A. Whether or not a student qualifies as "exceptional" depends on entirely secular statutory criteria. See supra note 2; see also LA.REV.STAT.ANN. § 1943(2)(West Supp. 1998). Thus, the statutory scheme implementing the special education program shows that any aid is "made available generally without regard to the sectarian-nonsectarian, public-nonpublic nature of the institution benefitted." Agostini, 117 S.Ct. at 2011, quoting Witters, 474 U.S. at 487.

Agostini seemed to require that "any money that ultimately went to [the sectarian schools] 'did so only as a result of the genuinely independent and private choices of' individuals." Agostini, 117 S.Ct. at 2011-12, quoting Witters, 474 U.S. at 487; see also Zobrest, 509 U.S. at 9. Relative to this requirement, the Court instructs us to examine the criteria by which the challenged program selects its recipients. Agostini, 117 S.Ct. at 2012. As we observed above, the Louisiana special education program selects its recipients based solely on the "exceptionality" of a particular student and on the number of exceptional students enrolled in a given school district. The fact that a particular exceptional student is enrolled in a particular school, be it sectarian or nonsectarian, results from a parental and not a governmental decision. Thus, any aid flowing incidentally to a sectarian school occurs "only as a result of the genuinely independent and private choices of" those students' parents. See Zobrest, 509 U.S. at 9.

41

Finally, <u>Agostini</u> mandates that any incidental benefits accruing to the sectarian schools as a result of the program cannot relieve the schools of costs they "otherwise would have borne in educating [their] students." <u>Agostini</u>, 117 S.Ct. at 2012. Failure to meet this requirement presupposes that the Jefferson Parish sectarian schools, in the absence of the special education program, would have "otherwise borne" the costs of providing special education services to their exceptional students. But only the State, and not the sectarian schools, has the legal duty to "provide an appropriate, free, publicly supported education to every exceptional child" residing in Louisiana. <u>See</u> LA.REV.STAT.ANN. § 17:1941 (West 1982). Since the sectarian schools are not required to provide such an education, we fail to see how the State's fulfilling its statutory obligation to do so relieves private schools of any burden at all. This case does not present the situation where the State furnishes aid which alleviates a private school's legal duty to provide, for example, a state-mandated core curriculum to its students. <u>Cf</u>. <u>Ball</u>, 473 U.S. at 396-97.

The district court made much of its conclusion that the sectarian schools receive a "direct economic benefit" as a result of the special education program, in the form of a student's tuition and the surcharge paid by parents to supplement the special education teachers' salaries. <u>See</u> <u>Helms</u>, 856 F.Supp. at 1117-18; <u>see also</u> discussion <u>supra</u> Part II.A. But to view the students'

42

tuition as an "economic benefit" requires the assumptions that "the school makes a profit on each student; that, without the [special education program], the child would have gone to school elsewhere; and that the school, then, would have been unable to fill that child's spot." Zobrest, 509 U.S. at 10-11. The Supreme Court was unwilling to make such assumptions and regard the deaf student's tuition as an "economic benefit" in Zobrest. See id. Given the Court's close reliance on Zobrest in Agostini, we are likewise unwilling to make them. See Agostini, 117 S.Ct. at 2012 ("In all relevant respects, the provision of instructional services under Title I is indistinguishable from the provision of sign-language interpreters under the IDEA."), citing Zobrest, 509 U.S. at 12.

Additionally, the surcharge required of parochial school parents is merely intended to equalize the salaries of special education teachers working in nonpublic schools to those of special education teachers working in public schools. See Helms, 856 F.Supp. at 1110, 1117.[13] We do not view the receipt of such a surcharge from parents as any kind of "economic benefit" to the sectarian schools. The record indicates that the surcharges are paid into accounts earmarked for "special education expenses" and are used exclusively to supplement the salaries of special education teachers. Id. at 1117. The district court thus erred when it considered this surcharge a "direct economic benefit" to

---

[13]In the public schools, this surcharge is paid by the JPSB. Id. at 1110; see discussion supra Part II.A.

43

the parochial schools.  Indeed, there is no discernible "benefit" flowing *to the schools* from the surcharge; rather, the surcharge represents an economic *burden* imposed on the parents of parochial school children who wish to secure special education services for their children.  The surcharge never reaches, in any meaningful way, the general coffers of the parochial schools.

b.

We need not long consider whether the criteria by which the special education program selects its beneficiaries "create a financial incentive to undertake religious indoctrination." Agostini, 117 S.Ct. at 2014.  We have already observed, in Part II.D.2.a, supra, that the Louisiana special education program selects its aid beneficiaries based on neutral, secular criteria: the exceptionality of the child and the number of exceptional students enrolled in Jefferson Parish and in its individual school districts.  These are "neutral, secular criteria that neither favor nor disfavor religion, and [the aid] is [therefore] made available to both religious and secular beneficiaries on a nondiscriminatory basis."  Agostini, 117 S.Ct. at 2014.  The Louisiana program does not "define its recipients with reference to religion" and therefore creates no financial incentive to undertake religious instruction.  Id. at 2016.  Indeed, as the district court stated:

> The Court finds that there was no financial
> incentive for the parents of special education
> students to choose a nonpublic school.  In
> fact, it is undisputed that the students would

44

> have received special education at no cost in the public schools. Indeed, the parents of special education students elected to pay an extra charge, in addition to the regular tuition, in order for their children to attend a parochial school.

Helms, 856 F.Supp. at 1117.

### c.

We likewise discern no "excessive entanglement" created or necessitated by the special education program. Now that the Supreme Court has discarded the presumption that publicly-paid teachers on sectarian school premises will inculcate religion, also relegated to the dustbin is the "assumption that pervasive monitoring of [those teachers] is required." Agostini, 117 S.Ct. at 2016. We have not been shown any evidence demonstrating that the monitoring already in place is "insufficient to prevent or to detect inculcation." Id. The district court specifically noted that "[t]he JPPSS special education teachers at nonpublic schools do not teach religion" and that "[t]he special education classrooms are used only for special education instruction." Helms, 856 F.Supp. at 1114. We see no reason to disturb those findings.

### E.

In sum, we find that the Louisiana special education program, codified at LA.REV.STAT.ANN. § 17:1941-1956 (West 1982 & West Supp. 1998), does not offend the Establishment Clause because (1) the statute has a secular legislative purpose, and (2) the statute does not have the effect of advancing religion. See Agostini, 117 S.Ct.

45

at 2016.  We therefore REVERSE the judgment of the district court and RENDER judgment declaring the Louisiana special education program constitutional as applied in Jefferson Parish.

III.

Plaintiffs also claim that Chapter 2 of Title I of the Elementary and Secondary Education Act of 1965 ("Chapter 2")[14] and its Louisiana counterpart, LA.REV.STAT.ANN. § 17:351-52 (West 1982 & West Supp. 1998), violate the Establishment Clause as applied in Jefferson Parish insofar as they provide direct aid to sectarian schools in the form of educational and instructional materials. Initially, the district court agreed and granted Plaintiffs' motion for summary judgment, finding that the loan of state-owned instructional materials (such as slide projectors, television sets, tape recorders, maps, globes, computers, etc.) to pervasively sectarian institutions had the "primary effect of providing a direct and substantial advancement to the sectarian enterprise" and therefore violated the Establishment Clause.  The court relied primarily on Wolman v. Walter, 433 U.S. 229, 250 (1977), and Meek v. Pittenger, 421 U.S. 349, 363 (1975).

When the case was reassigned due to Judge Frederick Heebe's

---

[14]On October 20, 1994, Congress enacted the Improving America's School Act of 1994, Pub.L. 103-382, 108 Stat. 3518.  Former Chapter 2 is now labeled "Subchapter VI -- Innovative Education Program Strategies" and is codified at 20 U.S.C. §§ 7301-7373 (West Supp. 1998).  For ease of reference, we will continue to refer to new Subchapter VI as "Chapter 2."  We will cite individual sections, however, by reference to citations in the current United States Code.

46

retirement, Judge Marcel Livaudais granted Defendants' motion to reconsider the court's ruling. Following the reasoning of the Ninth Circuit in <u>Walker v. San Francisco Unified School District</u>, 46 F.3d 1449, 1463-70 (1995), Judge Livaudais found that the reasoning in <u>Meek</u> and <u>Wolman</u>, <u>supra</u>, had been undermined by subsequent Supreme Court cases. He therefore reversed Judge Heebe's finding of unconstitutionality and granted Defendants' motion for summary judgment, declaring Chapter 2 and LA.REV.STAT.ANN. § 17:351-52 constitutional, facially and as applied in Jefferson Parish.

A.

Chapter 2 provides financial assistance through "block grants" to state and local educational agencies to implement eight "innovative assistance programs." <u>See</u> 20 U.S.C. §§ 7311(b); 7312(a),(c)(1); 7351. The challenged innovative assistance program describes

> programs for the acquisition and use of instructional and educational materials, including library services and materials (including media materials), assessments, reference materials, computer software and hardware for instructional use, and other curricular materials which are tied to high academic standards and which will be used to improve student achievement and which are part of an overall education reform program.

20 U.S.C. § 7351(b)(2).

Chapter 2 services are to be provided to children enrolled in both "public and private, nonprofit schools." 20 U.S.C. § 7312.

Section 7372 provides that a local educational agency shall equitably provide "secular, neutral, and nonideological services, materials, and equipment" to students who are enrolled in private nonprofit elementary and secondary schools within its boundaries. 20 U.S.C. § 7372(a)(1). Chapter 2 funds for the innovative assistance programs must supplement, and in no case supplant, "funds from non-Federal sources." 20 U.S.C. § 7371(b). The control of Chapter 2 funds, as well as title to all Chapter 2 "materials, equipment, and property," must be in a public agency, "and a public agency shall administer such funds and property." 20 U.S.C. § 7372(c)(1). In addition, any services provided for the benefit of private school students must be provided by a public agency or through a contractor who is "independent of such private school and of any religious organizations." 20 U.S.C. § 7372(c)(2).

Once Louisiana receives its Chapter 2 funds from the Federal government, the designated State Educational Agency ("SEA") allocates 80 percent of the funds to Local Educational Agencies ("LEAs"). Eighty-five percent of those funds are earmarked for LEAs based on the number of participating elementary and secondary school students in both public and private, nonprofit schools; 15% go to LEAs based on the number of children from low-income families. See 20 U.S.C. § 7312(a). During the fiscal year 1984-85, Jefferson Parish received $655,671 in Chapter 2 funds; about 70% of those funds were allocated to public schools and about 30%

48

to nonpublic schools.

In 1984, the State instituted a monitoring process to ensure that Chapter 2 materials were not being used for religious purposes. Nonpublic schools were encouraged but not required to sign assurances that they would only use loaned materials for secular purposes. Additionally, LEAs made monitoring visits to nonpublic schools, and the State made monitoring visits to the LEAs and to some nonpublic schools. After the United States Department of Education conducted an on-site visit to review the Louisiana Chapter 2 program in September, 1984, the Louisiana Department of Education made changes in monitoring LEAs. It increased, for example, the frequency of on-site visits by the Chapter 2 staff to LEAs from once every three years to once every two years.

The State also began reviewing the LEAs' monitoring process of the private schools. LEAs, however, have primary responsibility in Louisiana for monitoring their Chapter 2 programs and for compliance with all applicable State and Federal guidelines. When State Chapter 2 monitors visited the JPPSS in April, 1985, the monitors found that "the services, materials, equipment, [and] other benefits provided to nonpublic schools" in Jefferson Parish were not "neutral, secular and non-ideological."

A report of that evaluation prepared by the Bureau of Evaluation indicates that, while the LEAs "handle most of the administrative matters related to Chapter 2, the nonpublic schools make the decisions about how to spend their Chapter 2 allocations,

49

and they do so independently of one another." The report also states that "[e]xcept that funds cannot be spent for support of religious or ideological instruction, flexibility in the use of Chapter 2 funds puts a minimum of limitations on the kinds of expenditures allowed." During the 1986-87 fiscal year, for example, of the total amount of Chapter 2 funds budgeted for nonpublic schools ($214,080), $94,758 was spent to provide library/media materials, $102,862 was spent for instructional equipment, and $16,460 was spent for "local improvement programs."

Ruth Woodward, the Coordinator of the Chapter 2 program in Jefferson Parish, stated that library books are ordered for nonpublic schools, but not for public schools. Such library books are stamped "ECIA Chapter 2." Woodward reviews the titles of books and other Chapter 2 materials and deletes titles she finds inappropriate. After reviewing library book orders from 1982, Woodward discovered approximately 191 titles in violation of Chapter 2 guidelines and had the books recalled and donated to the public library.

Woodward also stated that she generally makes a single visit to a given nonpublic school during the year. During her monitoring visits, she stated that she has "normally" found that the Chapter 2 materials and equipment are used in accordance with Chapter 2 guidelines. A review of the instructional materials purchased with Chapter 2 funds during 1986-87 and loaned to nonpublic, parochial schools reveals the following kinds of items: filmstrip

50

projectors, overhead projectors, television sets, motion picture projectors, video cassette recorders, video camcorders, computers, printers, phonographs, slide projectors, etc. Woodward stated that no direct payments of Chapter 2 funds are ever made to nonpublic schools; the funds are retained and administered by her office.

The Louisiana counterpart to Chapter 2, LA.REV.STAT.ANN. § 17:351-52 (West 1982 & West Supp. 1998), requires the State Board of Elementary and Secondary Education to "prescribe and adopt school books and other materials of instruction, which it shall supply without charge to the children of [Louisiana] at the elementary and secondary levels...." LA.REV.STAT.ANN. § 17:351(A)(1)(West Supp. 1998). The statute also requires that the Board, or the State Department of Education, ensure that any books or instructional materials provided "are throughly screened, reviewed, and approved as to their content...." LA.REV.STAT.ANN. § 17:352(A)(1)(West Supp. 1998).[15] Judge Livaudais noted that an "overwhelming portion" of funds allocated under the Louisiana statute are used to purchase textbooks, and that Plaintiffs have not challenged this application of the statute.

Deposition testimony indicated that library reference books

---

[15]An additional section, creating a "Teacher Supplies Fund," became effective June 30, 1997, after Judge Livaudais granted Defendants' motion for summary judgment. See LA.REV.STAT.ANN. § 17:354 (West Supp. 1998), added by Acts 1997, No. 473, § 1, eff. June 30, 1997. Section 354 is not at issue in this appeal, but we note in passing that it provides, *inter alia*, State funds "for the purchase and loan of teaching materials and supplies" to nonpublic schools, under constraints similar to those in Chapter 2.

purchased pursuant to LA.REV.STAT.ANN. § 17:351 are ordered from lists approved by the Louisiana Board of Elementary and Secondary Education. Additionally, books and instructional materials may only be ordered from state-approved lists and sources.

B.

We will focus on the Ninth Circuit's decision in Walker, supra, because Judge Livaudais relied heavily on its reasoning and also because it is the only other Circuit decision to have addressed the constitutionality of Chapter 2.

In Walker, a panel of the Ninth Circuit confronted a Chapter 2 program that was, in all relevant respects, identical to the one we confront in Jefferson Parish.[16] The most significant aspect of the Walker panel's reasoning is devoted to assessing whether Chapter 2 has a "primary or principal effect of advancing religion."[17] Walker, 46 F.3d at 1464-69. The panel began by observing that, with the cases of Meek, Wolman and Board of Education v. Allen, 392 U.S. 236 (1968), the Supreme Court "drew a [constitutional] distinction between providing textbooks and providing other instructional materials -- such as maps, overhead

---

[16]Aside from the identical statutory provision governing the Walker program, the percentage distribution of Chapter 2 funds for the 1988-89 school year were substantially similar to figures for the Jefferson Parish program: 74% of Chapter 2 benefits to public schools and 26% to private schools in Walker, compared to, e.g., a 70%/30% split in Jefferson Parish during the 1984-85 school year.

[17]The panel easily concluded that Chapter 2 has the valid secular purpose of "improv[ing] education." Walker, 46 F.3d at 1464, citing Meek, 421 U.S. at 363.

52

projectors, and lab equipment -- to parochial schools or their students." Walker, 46 F.3d at 1464-65; see Allen, 392 U.S. at 248; Meek, 421 U.S. at 362-63; Wolman, 433 U.S. at 237. The panel, however, was not convinced that such a distinction was still the law. In its view, subsequent Supreme Court cases -- particularly, Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646 (1980), Ball, supra, and Zobrest, supra -- had "clarified the holdings of Meek and Wolman, and rendered untenable the thin distinction between textbooks and other instructional materials." Walker, 46 F.3d at 1465. The Ninth Circuit thus held that "under Chapter 2, the loaning of neutral, secular equipment and instructional materials to parochial schools does not have the primary or principal effect of advancing religion." Id.

The panel read Meek as an illogical departure from Allen, which had upheld a law requiring public school authorities to lend textbooks, free of charge, to both public and private school students. Allen, 392 U.S. at 248. The panel pointed out that "Allen ... rests on the robust principle that 'the Establishment Clause does not prohibit a State from extending the benefits of state laws to all citizens without regard for their religious affiliation." Walker, 46 F.3d at 1465, quoting Allen, 392 U.S. at 242. In the panel's view, however, the Court's subsequent decision in Meek departed from Allen's reliance on neutrality when Meek "upheld the provision of textbooks to parochial school students, but struck down the program which loaned instructional materials

53

and equipment...." <u>Walker</u>, 46 F.3d at 1465 (citations omitted); see <u>Meek</u>, 421 U.S. 362, 365-66.

Even though the Court's subsequent decision in <u>Wolman</u> explicitly upheld <u>Meek</u>, the <u>Walker</u> panel believed that "[i]n reaffirming <u>Meek</u>'s holding ... <u>Wolman</u> undermined <u>Meek</u>'s rationale." <u>Walker</u>, 46 F.3d at 1465; see <u>Wolman</u>, 433 U.S. at 238 (upholding <u>Meek</u> and <u>Allen</u>). Specifically, the panel concluded that <u>Wolman</u> had "eviscerated" <u>Meek</u>'s premise that "any state aid to the educational functions of a sectarian school is forbidden." <u>Walker</u>, 46 F.3d at 1465. <u>Wolman</u> did so, the panel reasoned, by "holding as constitutional a statute under which the State prepared and graded tests in secular subjects" for both public and private, parochial schools. <u>Id</u>. Thus, the <u>Walker</u> panel announced that the paltry sum of <u>Meek</u> and <u>Wolman</u> was

> the thin distinction -- unmoored from any
> Establishment Clause principles -- that state
> loans to parochial schools of instructional
> materials and equipment impermissibly advances
> religion, but state preparation and grading of
> tests and state loans of textbooks do not.

<u>Walker</u>, 46 F.3d at 1466.

In the panel's estimation, the true death-blow to <u>Meek</u>'s textbooks vs. other instructional materials dichotomy came three years later in <u>Regan</u>, which "recognized this weak distinction and clarified that the provision of instructional materials and equipment to parochial schools is not always prohibited." <u>Walker</u>, 46 F.3d at 1466. But, as the panel recognized in the next

54

sentence, Regan merely reaffirmed Wolman by "uph[olding] a law reimbursing parochial schools for the costs of administering tests required by the State."  Id.; see Regan, 444 U.S. at 655 ("We agree with the district court that Wolman controls this case."). Although Regan did not deal with the provision of instructional materials to parochial schools, and although Regan explicitly followed Wolman and said nothing about overruling Meek, the Walker panel nonetheless declared with perfect candor that

> Regan thus instructs us that the difference between textbooks and other instructional equipment and materials, such as science kits and maps, is not of constitutional significance.

Walker, 46 F.3d at 1466.  In our view, such a statement could *only* mean that the panel thought Regan silently overruled Meek.

The Walker panel thus adopted an Establishment Clause analysis based on what it identified as "the underlying principle animating Establishment Clause jurisprudence:  government neutrality towards religion."  Id. at 1466, citing, *inter alia*, Zobrest, 509 U.S. at 10.  The panel stated its "test" as follows:

> Government neutrality becomes suspect when, in practical effect, the governmental aid is targeted at or disproportionately benefits religious institutions, or when, in symbolic effect, the governmental aid creates a symbolic union between church and state.

Walker, 46 F.3d at 1467.  Applying its test, the panel easily found that Chapter 2 passed constitutional muster.  First, it found that Chapter 2 benefits were "neutrally available without regard to

55

religion" given that "an overwhelming percentage of beneficiaries [were] nonparochial schools and their students." Id.[18] Second, the panel found that the constraints under which Chapter 2 services were provided "adequately safeguard[ed] Chapter 2 benefits from improper diversion to religious use." Id. at 1467-68. Finally, the panel reasoned that, if the state-paid interpreter on sectarian school premises in Zobrest did not create a symbolic union between government and religion, then "certainly having religiously neutral material and equipment in the same classroom does not create a symbolic union either." Id. at 1468, citing Zobrest, 509 U.S. at 13.

Although it had already established (to its own satisfaction) that Meek and Wolman were no longer good law, the panel went on to distinguish the aid programs in those cases from Chapter 2:

> [T]he statutes struck down in Meek and Wolman are fundamentally different from the Chapter 2 statute at issue here. The statute in Meek was not neutral because it provided close to $12 million in aid that was targeted directly at private schools, of which more than 75% were church-related. Similarly, in Wolman, the statute was not neutral because it provided $88.8 million in aid that was targeted directly at private schools, of which 96% were church-related and 92% were Catholic. Here, seventy-four percent of Chapter 2 benefits went to public schools. Of the remaining twenty-six percent ... a substantial portion was allocated to nonreligious private

---

[18]The panel also found that, given the *de minimis* aid provided per student ($6.65 per student in 1988-89), "it is no surprise that Chapter 2 funds are supplementary and cannot supplant the basic educational services of the religious schools." Id.

56

> schools. Indeed, over thirty percent of the
> private schools under the Chapter 2 program
> are nonreligious. Thus, unlike the statutes
> in Meek and Wolman, Chapter 2 is a neutral,
> generally applicable statute that provides
> benefits to all schools, of which the
> overwhelming beneficiaries are nonparochial
> schools.

Walker, 46 F.3d at 1468.[19]

The Walker panel decision was not without its detractors, however. While Judge Fernandez agreed with the panel majority that the distinction drawn in Meek between textbooks and educational materials was "untenable," he nevertheless believed that Meek was still binding law. See Walker, 46 F.3d at 1470 (Fernandez, J., concurring and dissenting)("[The Supreme] Court has given us the book-for-kids versus materials-for-schools dichotomy. Only it can take it away."). Additionally, the Ninth Circuit's refusal to rehear the case *en banc* provoked a vituperative dissent by Judge Reinhardt (joined by Judges Pregerson and Hawkins). Judge Reinhardt excoriated the panel majority for shirking its "clear duty to invalidate the San Francisco Unified School District's provision of videos, overhead projectors, televisions, record players, and similar equipment to parochial schools." Walker v. San Francisco Unified School District, 62 F.3d 300, 301

---

[19]The panel also found that Chapter 2 did not violate the "entanglement" prong of Lemon, given the minimal intrusion onto the parochial schools premises by State monitors, and also given the "self-policing" nature of the neutral instructional materials and equipment. Walker, 46 F.3d at 1469, citing, *inter alia*, Meek, 349 U.S. at 365, and Zobrest, 509 U.S. at 13-14.

(1995)(Reinhardt, J., dissenting from denial of *en banc* rehearing). Judge Reinhardt repeatedly emphasized that <u>Meek</u> and <u>Wolman</u> were still binding precedent and that "[t]he distinction between textbooks and other educational materials is so clear and well-established as to defy legitimate judicial evasion." <u>Id</u>.

C.

When we carefully review the Supreme Court's pronouncements in <u>Allen</u>, <u>Meek</u>, <u>Wolman</u>, and <u>Regan</u>, it is tempting to complain that the high Court has instructed us confusingly. As merely one example, the Court in <u>Allen</u> registered its *disagreement* with the proposition "that the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." <u>Allen</u>, 392 U.S. at 248. Only seven years later, however, the Court was heard to say in <u>Meek</u> that "[t]he secular education [that parochial] schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. *Within the institution, the two are inextricably intertwined*." <u>Meek</u>, 421 U.S. at 366, <u>quoting</u> <u>Lemon</u>, 403 U.S. at 657 (opinion of Brennan, J.)(emphasis added). Lest we fall into despair, however, we will view the Court's cases dealing with state aid to religious schools more in terms of what they *did* rather than what they *said*.

When we take that approach, the solution becomes compellingly clear and simple. <u>Meek</u> and <u>Wolman</u> have squarely held that what the

58

government is attempting to accomplish through Chapter 2, it may not do.  No case has struck down <u>Meek</u> or <u>Wolman</u>.  We could take out our judicial divining rod and try to predict, on the basis of what has been said since <u>Meek</u> and <u>Wolman</u>, what the present Court would do if called upon to weigh the constitutionality of Chapter 2.  But such a course would, we think, take us beyond our role as a Circuit Court of Appeals, bound to follow the dictates of the Supreme Court.  And if our duty were not already clear enough, the Court has recently reminded us of it in <u>Agostini</u>:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.  We reaffirm that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, *the Court of Appeals should follow the case which directly controls*, leaving to this Court the prerogative of overruling its own decisions."

<u>Agostini</u>, 117 S.Ct. at 2017, <u>quoting</u> <u>Rodriguez de Quijas v. Shearson/American Express</u>, 490 U.S. 477, 484 (1989)(emphasis added).

<u>Meek</u> invalidated a Pennsylvania statute that authorized the Secretary of Education to lend to parochial schools "instructional materials" which included "periodicals, photographs, maps, charts, sound recordings, films, ... projection equipment, recording equipment, and laboratory equipment."  <u>Meek</u>, 421 U.S. at 354-55, 366;  <u>see also</u> <u>Meek</u>, 421 U.S. at 354 n.4 (complete statutory definition of "instructional materials.").  <u>Meek</u> is directly on

point and has not been overruled by any Supreme Court case. We thus "follow the case that directly controls." See Agostini, 117 S.Ct. at 2017.

In Allen, Meek, Wolman, and Regan, the Court drew a series of boundary lines between constitutional and unconstitutional state aid to parochial schools, based on *the character of the aid itself*. Allen approved textbook loans to parochial schools because the evidence did not indicate that "all textbooks ... are used by the parochial schools to teach religion." Allen, 392 U.S. at 248. While recognizing that books, if they were *religious* books, could have the effect of indoctrination, the Allen Court likened the *purely secular books* at issue there to the bus transportation subsidized in Everson v. Board of Education, 330 U.S. 1, 17 (1947): neither bus rides nor purely secular textbooks had "inherent religious significance." Allen, 392 U.S. at 244. While Justices Black and Douglas dissented in Allen, they did so based on a different conception of the role of textbooks in parochial schools. See Allen, 392 U.S. at 252 (Black, J., dissenting)("Books are the most essential tool of education since they contain the resources of knowledge which the educational process is designed to exploit."), and Allen, 392 U.S. at 257(Douglas, J., dissenting)("The textbook goes to the very heart of the education in a parochial school."). Both the majority and the dissenting opinions, however, consistently focused on the *character* of the aid

given to parochial schools.

Meek and Wolman, while both reaffirming Allen, nevertheless invalidated state programs lending instructional materials *other than textbooks* to parochial schools and schoolchildren. Meek merely intimated that the character of the aid was the determinative feature in its holding. See Meek, 421 U.S. at 364 ("[A] State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities -- *secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school*.")(emphasis added). But Wolman clarified that, in the Court's view, the character of the aid itself determined whether the aid was constitutional. Wolman did so by upholding several different types of aid (textbooks, administration of state-required standardized tests, speech/hearing diagnostic services, off-premises therapeutic/guidance/remedial services), while at the same time striking down, based on Meek, the loan of instructional materials to parochial schoolchildren. See Wolman, 433 U.S. at 236-38, 238-41, 241-244, 244-248, 248-252. The Wolman Court distinguished among these various types of aid by reference to the particular attributes of the aid itself. See, e.g., Wolman, 433 U.S. at 244("[D]iagnostic services, unlike teaching or counseling, have little or no educational content and are not closely associated with the educational mission of the nonpublic school.").

61

Wolman candidly recognized the "tension" existing between the holdings in Meek and Allen and sought to resolve that tension by emphasizing the unique character of the aid approved in Allen, i.e., that "the educational content of textbooks is something that can be ascertained in advance and cannot be diverted to sectarian uses." See Wolman, 433 U.S. at 251 n.18; see also Committee for Public Education v. Nyquist, 413 U.S. 756, 781-82 (1973).

Contrary to the Walker panel's view, Regan did nothing to "instruct us that the difference between textbooks and other instructional equipment and materials ... is not of constitutional significance." Walker, 46 F.3d at 1466. Regan did exactly the opposite. In seeking to harmonize the holdings of Meek and Wolman, the Regan Court merely observed that Meek did not forbid *all* types of aid to sectarian schools. See Regan, 444 U.S. at 661 . Indeed, as the Regan Court realized, if Meek stood for such a proposition, then Wolman's approval of, for example, the testing and grading services would have flown in the face of precedent. See id. Regan clarified that Meek only invalidates a particular kind of aid to parochial schools -- the loan of instructional materials. See id. at 662.

The Walker panel made a flawed attempt to avoid the holdings of Meek and Wolman by "distinguishing" the statutes at issue in those cases from the Chapter 2 program. The panel opined that the Meek and Wolman statutes were "fundamentally different" from

62

Chapter 2 because they were not "neutral."  Walker, 46 F.3d at 1468.  By this, the panel meant that the challenged programs in Meek and Wolman directly targeted massive aid to private schools, the vast majority of which were religiously-affiliated.  See id. By contrast, the panel distinguished Chapter 2 as a "neutral, generally applicable statute that provides benefits to all schools, of which the overwhelming beneficiaries are nonparochial schools." Id.  But Walker misunderstood the aid programs struck down in Meek and Wolman.

Those cases dealt with general aid programs designed to provide equitable benefits to *both* public and nonpublic schoolchildren.  See Meek, 421 U.S. at 351-52 ("With the stated purpose of assuring that *every* schoolchild in the Commonwealth will *equitably share* in the benefits of auxiliary services, textbooks, and instructional material provided free of charge to children attending public schools, the Pennsylvania General Assembly in 1972 *added* Acts 194 and 195 to the Pennsylvania Public School Code of 1949.")(citations omitted)(emphasis added), and Wolman, 433 U.S. at 234 ("All disbursements made with respect to nonpublic schools *have their equivalents in disbursements for public schools*, and the amount expended per pupil in nonpublic schools may not exceed the amount expended per pupil in public schools.")(emphasis added). The Meek and Wolman Courts, however, dedicated their discussion to those parts of the programs that channeled aid to *nonpublic*

63

schools, because it was the character of the aid provided to those schools, and *not* the relative percentages of aid distributed between public and nonpublic schools, that was determinative.  See Walker, 62 F.3d at 302 n.1 (Reinhardt, J., dissenting from denial of *en banc* rehearing).  Thus, the percentages discussed in Meek and Wolman were completely irrelevant to the constitutionality of the programs at issue there, as was the fact that the general aid programs might have been implemented by two separate statutes.  The Court observed in Meek, in a different context, that "it is of no constitutional significance whether the general program is codified in one statute or two."  Meek, 421 U.S. at 360 n.8.

Since Walker was decided before the Supreme Court handed down Agostini, we should add that Agostini also does not overrule Meek or Wolman;  nor does Agostini dismantle the distinction between textbooks and other educational materials.  In fact, Agostini does not even address that issue.  Agostini does, it is true, discard a premise on which Meek relied -- i.e., that "[s]ubstantial aid to the educational function of [sectarian] schools ... *necessarily* results in aid to the sectarian school enterprise as a whole." Meek, 421 U.S. at 366 (emphasis added).  But Agostini does not replace that assumption with the *opposite* assumption;  instead, Agostini only goes so far as to "depart[] from the rule ... that *all* government aid that directly aids the educational function of religious schools is invalid."  Agostini, 117 S.Ct. at 2011

64

(emphasis added).  Agostini *holds* only that the aid at issue there (i.e., the on-premises provision of special education services by state-paid teachers) was not the kind of governmental aid that impermissibly advanced religion.  Id. at 2016.  Agostini says nothing about the loan of instructional materials to parochial schools and we therefore do not read it as overruling Meek or Wolman.  Agostini only instructs us that Meek's presumption regarding instructional materials should not be applied to state-paid teachers on parochial schools premises.  See Agostini, 117 S.Ct. at 2012;  see also Ball, 473 U.S. at 395-96 (applying Meek and Wolman to state-paid teachers).

### D.

Applying Meek and Wolman, we hold that Chapter 2, 20 U.S.C. §§ 7301-7373, and its Louisiana counterpart, LA.REV.STAT.ANN. §§ 17:351-52 (West 1982 & West Supp. 1998), are unconstitutional as applied in Jefferson Parish, to the extent that either program permits the loaning of educational or instructional equipment to sectarian schools.  By prohibiting the loaning of such materials, our decree encompasses such items as filmstrip projectors, overhead projectors, television sets, motion picture projectors, video cassette recorders, video camcorders, computers, printers, phonographs, slide projectors, etc.  See, e.g., Meek, 421 U.S. at 354 n.4.  Our decree also necessarily prohibits the furnishing of library books by the State, even from prescreened lists.  We can

65

see no way to distinguish library books from the "periodicals ... maps, charts, sound recordings, films, or any other[] printed and published materials of a similar nature" prohibited by Meek.  See id. at 355 (internal quotes omitted).  The Supreme Court has only allowed the lending of free textbooks to parochial schools;  the term "textbook" has generally been defined by the case law as "a book which a pupil is required to use as a text for a semester or more in a particular class he legally attends."  Allen, 392 U.S. at 239 n.1.  We do not think library books can be subsumed within that definition.

We therefore REVERSE Judge Livaudais' grant of summary judgment in favor of Defendants and RENDER judgment declaring Chapter 2, 20 U.S.C. §§ 7301-7373, and its Louisiana counterpart, LA.REV.STAT.ANN. §§ 17:351-52, unconstitutional as applied in Jefferson Parish.

IV.

Plaintiffs also challenge an agreement between the JPSB and the Jefferson Non-Public School Transportation Corporation (the "Corporation") entered into pursuant to LA.REV.STAT.ANN. § 17:158 (West 1982 & West Supp. 1998), under which the JPSB makes payments to the Corporation, which in turn arranges transportation for students to six parochial schools in Jefferson Parish.  Plaintiffs argue that the agreement impermissibly delegates civil authority to a group (the Corporation) dedicated to serving religious interests, in violation of the Establishment Clause, and furthermore that the

66

agreement violates the neutrality requirements of the Establishment Clause by privileging six sectarian schools over other public and nonpublic schools. The district court, after a bench trial, disagreed, finding the arrangement constitutionally indistinguishable from the arrangement upheld in Everson v. Board of Education of Ewing, 330 U.S. 1 (1947). See generally, Helms, 856 F.Supp. at 1133-55.

## A.

Louisiana law requires that "each parish and city school board shall provide free transportation for any student attending a school of suitable grade approved by the State Board of Elementary and Secondary Education within the jurisdictional boundaries of the parish or school board if the student resides more than one mile from such school." LA.REV.STAT.ANN. § 17:158(A)(1)(West Supp. 1998). A subsection of the same statute provides that "nothing ... shall prohibit a parish or city school from entering into contracts or mutual agreements for providing school bus transportation." LA.REV.STAT.ANN. § 17:158(A)(4)(West Supp. 1998). The JPPSS provides free transportation to eligible public and nonpublic school students. Since 1988, nonpublic and public student bus transportation has been funded through separate appropriations of state funds. Bus drivers are paid through a combination of state funds and local supplements.

During the 1988-89 school year, funding reductions for Jefferson Parish nonpublic school transportation caused the JPSB to

cut local supplements for nonpublic schools. To make up for the shortfall, the Archdiocese of New Orleans agreed to contribute funds and thereby ensure the restoration of certain Catholic, nonpublic schools' transportation services to the prior year's level. Parents of schoolchildren at those nonpublic schools were thereafter required to pay a supplement to offset transportation costs. Nevertheless, the JPSB discontinued some of the nonpublic school transportation in May 1988, because JPSB had not received all of the necessary funds from those nonpublic schools.

In 1989, the State increased nonpublic school transportation funding to Jefferson Parish by $278,788, for a total of $1,490,637. The Archdiocese of New Orleans and the State decided that part of these additional funds would be used to provide privately contracted bus service for those students who had been eliminated from the transportation plan. Consequently, the Jefferson Non-Public School Transportation Corporation was formed on September 28, 1989. The stated purposes of this non-profit Corporation included

> [the provision of] transportation for the children of parents residing in the Parish of Jefferson who have enrolled their children in parochial schools within the Parish of Jefferson other than their own church parish because of the fact that the parish in which said parents reside does not operate a parochial school....

Helms, 856 F.Supp. at 1149. The Corporation had members from six nonpublic schools: St. Christopher, St. Catherine of Siena, St.

68

Louis King of France, St. Agnes, St. Angela Merici, and St. Matthew the Apostle.

On February 6, 1990, JPSB paid the Corporation $100,195 "in lieu of transportation services previously provided by the [JPPSS] for some of the students attending [the six Catholic schools]." Id. The Corporation paid the funds to "privately contracted bus drivers" who provided bus services to 368 students attending the six schools. Id. at 1149-50. The district court specifically found that "the funds paid to the [Corporation] were clearly spent for transportation of nonpublic school students." Id. at 1150.

B.

We agree with the district court that the agreement between the JPSB and the Corporation to provide funds for the transportation of nonpublic school children does not violate the Establishment Clause. See Helms, 856 F.Supp. at 1150-55. The allocation of funds to the Corporation is simply one part of a broader, general program by which the State and Jefferson Parish provide a secular, noninstructional service to sectarian and nonsectarian schoolchildren alike.

The Supreme Court's decisions in Everson and Wolman furnish the guideposts for our discussion, although, as we make clear below, the Jefferson Parish program we confront here falls somewhat between the facts of those cases. In Everson, the Court approved a New Jersey program by which the State reimbursed parents for the cost of sending their children to and from school, whether public

69

or parochial.  Everson, 330 U.S. at 17.  The Court analogized the reimbursement to situations "where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools," or where "state-paid policemen ... protect children going to and from church schools."  Id.  Such services, in the Court's view, were "separate and ... indisputably marked off from the [schools'] religious function."  Id. at 18.  Wolman restated the holding in Everson in the following way:

> The critical factors ... are that the school has no control over the expenditure of the funds and the effect of the expenditure is unrelated to the content of the education provided.  Thus, the bus fare program in Everson passed constitutional muster because the school did not determine how often the pupil traveled between home and school -- every child must make one round trip every day -- and because the travel was unrelated to any aspect of the curriculum.

Wolman, 433 U.S. at 253.

Wolman, by contrast, invalidated an Ohio statute which authorized the State to expend funds to provide "field trip transportation" to nonpublic school students on an equal basis with public school students.  The Court pointed out that in Wolman, unlike Everson, the nonpublic school controlled "the timing of the trips and, within a certain range, their frequency and destinations."  Id.  Additionally, the Court believed that "field trips," given the inevitable discussion accompanying them and the parochial schoolteacher's input and guidance, "are an integral part

70

of the educational experience." <u>Id</u>. at 253-54.

The Jefferson Parish program falls somewhere in the gray area between <u>Everson</u> and <u>Wolman</u>. Certainly the *content* of the aid provided through the JPSB-Corporation agreement is for our purposes identical to the aid provided in <u>Everson</u>: getting a child to and from school once a day. There is no evidence, as the district court found, that the funds were used for anything other than such transportation. <u>See</u> <u>Helms</u>, 856 F.Supp. at 1150. The *means* by which the aid was administered, however, bear a vague resemblance to <u>Wolman</u>. The funds are paid, not as reimbursements to parents, but instead as a subsidy for transportation costs to a private, non-profit corporation, whose "members" were parents of children attending the six schools at issue.[20] This system is at least superficially similar to the direct payments, over which the nonpublic schools had virtually unfettered discretion, condemned in <u>Wolman</u>. <u>See</u> <u>Wolman</u>, 433 U.S. at 253-54.

Although again we must perform a balancing act between permissible and impermissible aid to sectarian institutions, we find that the arrangement at issue here bears more of a resemblance to the program upheld in <u>Everson</u> than to the one struck down in <u>Wolman</u>. The primary consideration guiding us is the character of

---

[20]In rejecting the Plaintiffs' Motion for Reconsideration of Judge Heebe's ruling on the transportation issue, Judge Livaudais found that the Corporation was "non-religious and was set up exclusively to hire bus drivers to drive these children to and from school...."

the aid provided.  Here, as in <u>Everson</u>, the payments are earmarked for a wholly secular function lacking in any educational content whatsoever -- the transportation of schoolchildren to and from school.  There is no danger, as there was in <u>Wolman,</u> that parochial teachers will subvert the state-funded process to further their own sectarian aims; indeed, the religious teachers have no role in this kind of transportation, and, as the district court assured us, "[t]here has been no evidence presented that JPPSS bus drivers might impart religious beliefs to their bus passengers."  <u>Helms</u>, 856 F.Supp. at 1151.

Although the means through which the aid gets to religious institutions -- the Corporation -- did give us pause initially, in the end we believe that the Corporation serves merely an administrative function in the aid process.  The Corporation acts as a conduit through which the funds pass and is administered by the parents of schoolchildren.  The Supreme Court has already approved direct reimbursements to parents in <u>Everson</u>; it would exalt form over substance to draw a constitutional distinction where the funds are paid, not to the parents themselves, but to a private corporation with the same parents as members.  Furthermore, we have seen no evidence indicating that the Corporation exercises unfettered discretion over the funds.  Instead, as both district judges who considered the issue concluded, the Corporation is dedicated exclusively to facilitating secular transportation services for its  members' students and has no religious objectives

72

at all. Finally, no evidence indicates that the funds were used for anything but the permissible purpose of providing transportation services to nonpublic schoolchildren. See Helms, 856 F.Supp. at 1150.

We also reject Plaintiffs' argument that the transportation payments violate the neutrality requirements of the Establishment Clause because the Corporation is dedicated to serving only six nonpublic schools. This contention overlooks the fact that the Corporation focused on the six schools at issue because they had been *excluded* from local funding due to cuts in transportation funds from the state. Thus, the Corporation exists, not to *privilege* these six parochial schools, but instead to bring them to a level of services *equal* to other schools. Finally, the eligibility requirements for transportation aid are generally applicable to all students, both public and nonpublic. Any differences among the level of services provided from school to school (e.g., frequency and pattern of busing routes, local supplement levels, etc.) arise from administrative concerns that have nothing to do with religion. Indeed, as the district court, found, although the State strives to make transportation services available equitably to both public and nonpublic students, "it appears ... that greater benefits are provided to the public school students." Helms, 856 F.Supp. at 1152. We cannot understand how the Plaintiffs then complain that the transportation payment scheme

operates to the unfair *benefit* of the six Catholic schools at issue here.

Based on <u>Everson</u> and <u>Wolman</u>, we AFFIRM the district court's determination that the transportation payments to the Corporation, by virtue of LA.REV.STAT.ANN. § 17:158, are constitutional.

V.

In sum, then,(1) we REVERSE the district court's decision in favor of Plaintiffs and RENDER judgment in favor of Defendants declaring the Louisiana special education program, LA.REV.STAT.ANN. § 17:1941-1956, constitutional as applied in Jefferson Parish; (2) we REVERSE the district court's grant of summary judgment in favor of Defendants and RENDER judgment in favor of Plaintiffs declaring that the Federal instructional materials program, 20 U.S.C. §§ 7301-7373, and its Louisiana counterpart, LA.REV.STAT.ANN. §§ 17:351-52  are unconstitutional as applied in Jefferson Parish; and, (3) we AFFIRM the district court's decision in favor of Defendants that the transportation payments to the Jefferson Non-Public School Transportation Corporation, by virtue of LA.REV.STAT.ANN. § 17:158, are constitutional.

AFFIRMED in part; REVERSED in part and JUDGMENT RENDERED.

74